Kennon, J.
In the fall of the year 1851, David D. Ogden was the equitable owner of lot No. 193, in the town of Republic, Seneca county, Ohio — upon which Jacob Young held a lien, by mortgage, for about $110, with interest. The naked legal title was in a man by the name of Christian Myers, who was bound to convey to David D. Ogden, the complainant, and was ready and willing to do so.
Gilbert M. Ogden had been the owner of lot No. 227, in the same town, and by a written agreement had agreed to convey the same to William McMillen, upon the payment to him by McMillen of the sum of $850. McMillen had paid to Gilbert M. Ogden $200, leaving a balance still due of about $650.
An agreement was entered into between David D. Ogden and McMillen, by which David D. Ogden was to pay the hundred and ten dollars due to Jacob Young, and $400 of the $650 due to Gilbert M. Ogdbn; and McMillen was to assign to David D. *Ogden the title-bond for lot No. 227, on Gilbert M. Ogden, so that upon payment of the purchase money to Gilbert M. Ogden, David might procure the title to lot 227 directly from Gilbert M. Ogden, in whom the legal title was then vested.
McMillen was to pay the balance of the purchase money due to Gilbert M. Ogden on lot No. 227, being about $250. It was further agreed between David D. Ogden and McMillen, that David D. Ogden should procure the title to lot No. 193, to be made by Christian Myers to McMillen, and that McMillen should execute a mortgage on lot No. 193 to Gilbert M. Ogden, to secure the balance of the purchase money of $250 to Gilbert M., on lot No. 227.
David D. paid to Gilbert M. the $400 which he was bound to pay, or at least secured the payment of the same to the satisfaction of Gilbert. He also procured Christian Myers to execute a deed, and *188 acknowledge the same, purporting to convoy to McMillen lot'No. 193. This deed was not' delivered to McMillen, but to David D. Ogden, who, with McMillen’s assent, delivered the same to Gilbert M. Ogden, to be by him delivered to McMillen, upon McMillen securing to Gilbert, by mortgage on lot No. 193, the balance due Gilbert on lot No. 227, being the two hundred and fifty dollars which McMillen had bound himself to David D. to pay to Gilbert M.
About the month of March, 1852, McMillen, under pretense of procuring a description of lot No. 193, px’ocured from Gilbert M. Ogden the deed thus deposited with him by David D. Ogden, without previously having assigned and delivered to Gilbex't the title bond, which he had executed to McMillen, or having executed to Gilbert a note or mortgage for the balance of the purchase money due Gilbert. McMillen havixxg thus procured possession of the deed made by Myers, and purporting to coixvey to McMillen lot No. 193, executed two mortgages on the lot, one to secure to a man by the name of "Watson, a debt of between one and two huxxdred dollars, and one to secure to Johxi Stroh a debt of ^between two and three hundred dollars; and afterward executed a note to Gilbex’t M. Ogden for the $250, payable one year after date, axid executed a mortgage to secure this last note, and caused the same to be delivered to him as he, McMillen, was about to leave in the cars for Califoxuxia; but this note and mortgage were not accepted by Gilbert M, Ogden as satisfactory. The other two mortgages wex’e duly received.
McMillen did not assign or deliver to Gilbert, for David D. Ogden, the title bond.
The bill in this case was filed by David D. Ogden, substantially stating the above facts, and further, that Watson axxd Stroh combined with McMillen to cheat. and defraud the complainant. The bill px-ays that the lien of the complainant, for the payment of the $250 may be held to be the fix’st and best lien after Young’s mortgage, that the deed to McMillen may be set aside, as well as the mox-tgages of Watsoxx axxd Stroh, that Gilbert may be compelled to convey lot No. 227 to complainant, axxd for general relief.
Watsoxx, Stroh, Young, axxd Gilbert M. Ogden, axiswer; replications are filed to the answers of Watson and Stroh, axxd the bill as fc McMillen is taken pro confesso. The deposition of Gilbert M. Ogden is taken, and there is no other evidence except some written contracts.
If we look to the written contracts between David D. .Ogden and *189 McMillen, they seem to be little else than title bonds, by which David agrees to convey to McMillen lot No. 198, on or before the first day of November, 1851, in consideration of four hundred and fifty dollars paid; said lot being a part payment for lot No. 227. And McMillen by a like instrument binds himself to convey to David D. Ogden, lot No. 227, on or before the same day, November, 1851, upon a conveyance being-made to McMillen of lot No. 193, and a payment of $400 being made to Gilbert M. Ogden on account of the purchase by McMillen from Gilbert.
Neither of-these contracts is under seal, nor *does either of them mention the fact that David D. Ogden is to pay the mortgage of $110 on lot No. 193, nor the fact that McMillen is to pay the balance due Gilbert M. Ogden of $250 or $230, nor that Meyers is to make a deed direct to McMillen for lot No. 193, and that Gilbert M. Ogden, after being paid the balance of his purchase, is to make a deed to David for lot No. 227. Still, inasmuch as each bound himself to make a warranty deed to the other, the effect would be that each would have to answer to the other for any damages he might sustain by reason of the respective liens on the lots; and we have come to the conclusion, from the facts in the case and the testimony of Gilbert M. Ogden, that a parol contract did exist between David D. Ogden and McMillen, that McMillen was to assign the contract which he had with Gilbert M. for lot 227, and' pay the balance due Gilbert of either $230 or $250, and secure the same to satisfaction of Gilbert on lot No. 193, by a mortgage executed at the same time of the delivery of the deed'from Myers to McMillen, and which mortgage was to have the first lien on McMillen’s title to that lot, and that a deed was to be made by Gilbert to David D.. Ogden on receipt of the purchase money. That although McMillen and David Ogden each agreed to make to the other a deed with clauses of warranty, yet, by a subsequent parol agreement, neither was to make the deed in fact, but to procure the same to be made, and to remove certain liens on the same.
Gilbert M. Ogden says, in his deposition, that “ in the winter of 1852, David D. Ogden and William F. McMillen came to me, and they then said to me that they had traded lots, and that David D. Ogden was to pay me four hundred dollars, for which David gave me his note; and it was then understood by myself, McMillen, and D. D. Ogden that I should retain possession of a certain deed which he, the said D. D. Ogden, handed me, which deed was executed by *190, 191 one Christian Myers and wife, which deed, with covenants of general warranty, conveyed to the said McMillen lot No. 193 in the town of Bepublic; which said deed I was to *keep possession of until said McMillin should deliver to me a certain title bond which I had given to said McMillen, conditioned that I was to execute unto him a deed for inlot No. 227, which bond was to be assigned by said McMillen to David D. Ogden, so that I could make a deed to D. D. Ogden; and the said McMillen was further to secure me the amount which he still owed me, the same being the residue of the purchase money for said lot No. 227, which amount was $230, to which amount was added $20 of other indebtedness, making $250, which the said McMillen agreed to secure by giving me a note and mortgage on lot No. 193. That after he (McMillen) had executed said note and mortgage, and delivered up and transferred said title bond as aforesaid, I was to deliver to said McMillen the said deed from the said Myers, which, by the terms of the agreement, as before stated, had been deposited with me by the said David D. Ogden.”
Taking this testimony of Gilbert M. Ogden as true — and we have no reason to doubt its truth — the deed executed by Myers and wife was deposited with the witness, to be delivered to McMillen upon the performance, on his part, of two conditions: 1. He was to assign to David D. Ogden the bond of Gilbert M. Ogden, and deliver the same to Gilbert. 2. He was to execute a note to Gilbert for the residue of the purchase money due on lot No. 227, and secure the payment thereof by a mortgage on lot No. 193. McMillen, to say the least of it; procured the possession of this deed without complying with either of these conditions, and immediately thereafter incumbered, so far as he could, the lot upon which the residue of the purchase money for lot 227 was to be secured.
The express parol agreement between McMillen and David D, Ogden was that McMillen was, by mortgage on lot No. 193, to secure to Gilbert M. Ogden $250, of which sum $230 was the residue of the purchase money due Gilbert M., without the payment . *of which Gilbert could not be compelled to make a deed to David — the payment or security for the payment of which was for the benefit of David, without which he could not procure his title. David had already satisfied Gilbert for $400 of the purchase money. And, although this was a parol contract, yet, as between David and McMillen or other persons, we know of no reason why a court of equity would not compel a specific performance of the agreement, *192 where, as in this ease, the statute of frauds is not interposed by plea or answer. If a bill had been filed against McMillen alone by David D. Ogden, to compel him to execute such an agreement, and McMillen had not claimed the benefit of the statute of frauds, a court of equity would have decreed a specific performance of the contract.
There is nothing to prevent such a decree in this case, unless it be true that Watson and Stroh are bona fide purchasers without notice, and unless it be also true that McMillen acquired title to lot No. 193, so as to be able to convey the same by mortgage to them.
It is claimed by the complainant, that the deed executed by Myers to McMillen, was delivered to Gilbert M. Ogden as an escrow, to be by him delivered to McMillen, upon certain conditions to be performed by McMillen, and that, until the performance of such conditions, no delivery could be made by Gilbert, nor could any title pass to McMillen. That such was the intention of the parties, we have no doubt. On the other side, it claimed that David D. Ogden was a stranger to the deed, and that he had no power to deliver the deed, as an escrow, to Gilbert. That upon the execution of the deed by Myers, the title immediately passed to McMillen; that this deposit of the deed by David D. with Gilbert M., was not made pursuant to the law of escrow; that to constitute a good escrow, the deed must be delivered by the grantor to a stranger, to bo by him delivered to the grantee, upon the performance of some condition in which the grantor had an interest, over which he had control, or which he *had the right to direct; that^ the law defines an escrow to be, where a man makes a deed, or written instrument, and delivers it to a stranger, to hold till certain conditions are performed by the grantee, and then to be delivered to him, to take effect as his deed; that it is essential that the delivery be made to a stranger, and not to the party.
It is claimed that the grantor (Myers) had nothing whatever to do with the delivery, in this case, to Gilbert M. Ogden, and knew nothing about it, and, therefore, Gilbert could not hold the deed as an escrow.
In the first place, it may be observed that Myers, the grantor in the deed, at the time of its execution had no interest in the lot whatever, except as naked trustee. David D, Ogden had all the beneficial interest in the lot, and Myers was willing, in discharge *193 of Ms obligation to David D., either to execute a deed to David D., or to McMillen. A conveyance by Myers to McMillen, with knowledge of David D. Ogden’s interest, would have conveyed to Mc-Millen nothing but the naked legal title. The whole beneficial interest in the lot would still have remained in David D. Ogden. It was this beneficial interest, as well as the legal title, which David had contracted to convey, and which McMillen had contracted to receive. The only interest in the lot which was worth having, was the interest held by David D. Ogden, and which could pass to McMillen by the consent of David D. only. Myers, without the consent of David, had no power to convey this equitable interest to McM'illen. It was David alone who had the control of this interest. He might consent to the unconditional transfer of the legal and equitable interest, or he might refuse to consent to the conveyance of his own interest. David D. was, therefore, in equity and in substance, the grantor in the deed, and Myers the mere instrument through whom the conveyance was to be perfected. David D. was not, therefore, a mere stranger to this conveyance; and if he cliose to annex a condition to the delivery of the deed, viz., that it should be delivered to a third ^person, to be delivered to McMillen upon the performance of certain conditions, he had a perfect right to do so; at least, with the assent of Myers. And, in this case, we would have no hesitation in finding, under the circumstances, that Myers himself, at the request of David, caused this deed to be delivered as an escrow, if it were necessary to find such fact: for it is very evident that Myers made the deed at the request of David D. Ogden, and would attach just such conditions to the delivery as David D. might direct.
The testimony shows, that the deed was in the possession of David D., and not of McMillen, when delivered to Gilbert, as an escrow.. This delivery may well be considered the delivery of Myers, the nominal grantor, through his agent, David D. Ogden, to Gilbert M. Ogden, a stranger, and upon condition; and therefore coming within the definition of an escrow. But we do not deem this necessary. We think that David D., being the real owner of the lot, might procure a deed from the trustee, to be executed to any person, have the same delivered to himself, and that he (David) might attach any conditions he might see proper, before he delivered the deed to the nominal grantee. To take the other view of this question, and held that, execution of the deed *194 and delivery to David D. Ogden, the title passed to McMillen, would, in our opinion, be to lose sight of the substance of this, whole transaction, and vest title in McMillen, against the consent of the holder of the legal title, the holder of the equitable interest, and very much to the surprise of the grantee himself, who never calculated on any such result.
It is however further claimed by Watson and Stroh, that they are bona fide mortgagees, for a valuable consideration, without any knowledge of the agreement between McMillen and David D. Ogden ; and that, therefore, they can not be prejudiced by the deed having been delivered to McMillen by Gilbert M. Ogden, without McMillen’s compliance with the conditions upon which a delivery was to be made to him.
*A deed takes effect from delivery; without delivery it is not a deed. The deed executed by Myers, could not be delivered by Gilbert M- Ogden, or any other person with whom the same might-have been deposited as an escrow, until the conditions upon which the delivery was to take place, had been complied with by McMillen. McMillen did not comply with either of the conditions required of him, before he obtained possession of the deed. These-conditions were annexed for the benefit of David D. Ogden: one of which was, an assignment to David of Gilbert’s title bond to Mc-Millen, for lot No. 227 ; and the other was, that he should secure by mortgage on lot No. 193, the payment to Gilbert of the balance of the purchase money, so that David would have a right to .obtain, from Gilbert a clear title to lot No. 227. Without the payment of this balance, David was not entitled to a deed for the lot. McMillen did neither of these things, but as we read the testimony, he obtained the deed for the purpose of getting a description of the property, that he might execute the mortgage to Gilbert. The deed was neither delivered, nor intended to be delivered, by Gilbert, to McMillen; and, therefore, as between Myers and David D. Ogden on the one part, and McMillen on the other, no title, either legal or equitable, to lot No. 193, passed to McMillen. And assuming the-fact to be, as we find it to be, that these conditions to be performed by McMillen were for the benefit of David D. Ogden, and not Gilbert, McMillen, as against David, would have acquired no title to-the lot, even if Gilbert had actually delivered the deed, intending, thereby to pass the title to McMillen.
Gilbert M. was clothed with a special authority, and that known *195, 196 to McMillen, by which he could not deliver the deed, until the conditions on which it was to be delivered were complied with.
But admitting' all this to be true, it is still claimed, and with reason too, that if David reposed confidence in Gilbert, and he violated that confidence and delivered the deed, and loss is to fall on ^either David or the mortgagees, that David should sustain that loss, and not the innocent mortgagees. This position can not be denied, if fault is to be attributed either to David or to his agent, Gilbert, by which the mortgagees were misled to their injury.
There is a class of cases, however, to which this doctrine does not apply. A loans his horse to B, and B sells to C; A may recover the horse from C, although A reposed confidence in B, by which he obtained possession of the horse, and thereby enabled him to hold himself out as the owner of the horse.
In this country no one can obtain title to stolen property — money and bank notes possibly excepted — however innocent he may have been in the purchase; public policy forbids the acquisition of title through the thief.
So also, we apprehend, if one forges a deed for another’s projoerty and puts it upon record, he neither acquires nor has power to convey any title to such property. The original fraud so taints the transaction that a bona fide purchaser from such source could claim as against the real owner, no title whatever to the property.
So, if one intending to convey his land to another, ujjon being paid for the same, executes in due form of law a deed for the land, the grantee pays nothing, but steals from or robs the grantor of the deed, and puts it upon record, and makes sale to a stranger, who bona fide for a valuable consideration purchases the same, such stranger would acquire no title whatever to the land.-
If the owner of land makes a deed purporting to convey his land to any one, and. such person, by fraud or otherwise, procures the owner to deliver the deed to him, a bona fide purchaser from such fraudulent grantee, without notice of the fraud, might acquire title to the land. But if the deed never was in .fact either delivered or intended to be delivered by the grantee, or his agent, and the named grantee surreptitiously obtained- mere possession *of the deed, a bona fide purchaser from such holder of the deed, would no more acquire title thereby than if the grantee had stolen the deed from the grantor’s possession; such deed would be no more the deed of *197 the grantor than if it had been a forgery. It wanted that which is essential to any deed, as essential as the signing of the deed, viz., a delivery.
In this case, as we understand the testimony, this deed was neither delivered, nor intended to be delivered. And we hold that neither McMillen nor his grantees or mortgagees obtained any title to lot No. 193; that the whole beneficial interest in the lot is still in David D. Ogden.
This beneficial or equitable interest in this lot thus belonging to D. D. Ogden, he never agreed to convey to McMillen, until McMillen created a lien thereon, to secure the payment for the' benefit of David D. of the balance due to Gilbert M., and if instead of Myers conveying to McMillen he had conveyed to D. Ogden, Ogden, by his agreement, was bound to convey to McMillen the lot, subject to the payment of the balance of the purchase money on the other lot. David D. Ogden had precisely the same equity to have the purchase money paid on lot No. 227, as he would have had if he had agreed to sell to McMillen lot No. 193, and McMillen had agreed to secure the balance of the purchase money on the same, being the sum of $250. These $250 are in fact a part of the consideration which McMillen agreed for the conveyance to him of lot No. 193, to pay for D. D. Ogden’s benefit to Gilbert M., to enable David to get a title for the lot No. 227.
After a full examination of the arguments made and authorities cited by defendants, Watson and Stroh, we are of opinion that David D. Ogden is entitled, by his contract, to have the balance of the purchase money due Gilbert M. Ogden paid by McMillen, and that, after the mortgage of Young, David is entitled to have the first lien on lot No. 193, for that purpose, whether that lien shall be in the name of Gilbert or David. That, *as the money is now due, the lien will be enforced by decree instead of mortgage.